IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE UNITED STATES DEPARTMENT OF TRANSPORTATION, *ex rel.* AUGUST W. ARNOLD, | ) ) ) ) | Civil Action No. 03-1580 |
| Plaintiff, | ) ) | District Judge Cathy Bissoon |
| v. | ) ) ) | |
| CMC ENGINEERING, INC., | ) ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

**I. MEMORANDUM**

This is a <u>qui</u> <u>tam</u> action under the False Claims Act ("FCA"), 31 U.S.C. §3729(a)(1)(A)-(B). August W. Arnold brings this action on behalf of the U.S. Department of Transportation, alleging that CMC Engineering misrepresented the credentials of its consultants to obtain higher pay rates for work performed on state projects that were paid for with federal funds. [Doc. No. 210] Arnold seeks an injunction preventing CMC from further violating the FCA, as well as damages and penalties. CMC has filed a Motion for Summary Judgment [Doc. No. 415], which, for the reasons stated herein, will be granted.

**BACKGROUND**

The Pennsylvania Department of Transportation is charged with constructing, maintaining and repairing the Commonwealth's major roadways. PennDOT regularly receives funds from the Federal Highway Administration ("FHWA") to pay for its highway projects,

which it then disburses to private contractors hired to complete the work. Federal monies often comprise 80 percent of the funding for PennDOT's projects.

PennDOT routinely hires private engineering firms to provide inspection services on its construction projects. In turn, these private firms independently contract with individual engineering inspectors, whose credentials the firms submit to PennDOT when they bid on the work. All private inspectors who perform work for PennDOT must possess certain minimum professional qualifications. These qualifications are established by PennDOT and are sorted into a hierarchy of "inspector classification levels" based on various combinations of educational and skills credentials, certifications and experience. The more qualifications an inspector possesses, the higher the inspector's classification level, and, thus, the higher the hourly rate of pay the firm may bill PennDOT for the inspector's services.

The inspector classification levels are made known to interested firms during the bidding process and are described in PennDOT's contracts. In ascending order, the classification levels are: Technical Assistant; Technical Assistant-1; Transportation Construction Inspector; Transportation Construction Inspector-Materials; Transportation Construction Inspector Supervisor; Transportation Construction Manager-1; and Transportation Construction Manager-2. An inspector cannot work on a PennDOT project without PennDOT's prior approval. Because the number of construction inspectors is small and competition for their services is intense, PennDOT is familiar with many of them, and, on at least one occasion, it instructed that a particular inspector be classified at a higher level than her qualifications justified because it wanted to secure her services.

A. **Inspector Qualifications**

From 1994 until 2003, PennDOT incorporated into all of its engineering contracts a standard form outlining the staffing requirements that inspection personnel were required to meet. During the relevant timeframe, this form was the only guidance that PennDOT provided to the consultant firms regarding inspector qualifications.

For the seven inspector classification levels referenced above, the form required either certification under "NICET"[1] and a certain number of years of work experience, or educational training and a certain number of years of work experience. The form also established for each contract: (1) a "Scope of Work," indicating the number of inspectors required to possess certain minimum qualifications, as specified by PennDOT and the consultant firm; and (2) a document entitled "Attachment A," which described in more detail the combination of certifications, educational background and field experience that the consultant's entire staff of inspectors was required to possess at each level.

The Scope of Work section required that the inspection staff "meet the requirements shown in the Tables A, B, and C," and to "meet the minimum NICET Certification or State Equivalency requirements for the appropriate Department Inspection Classification," also indicated in "Tables B and C."

Table A listed the minimum number of inspectors, based on the total number of inspectors working on a project, who were required to possess at least one of five possible combinations of education and experience. The levels of experience required by four of these five combinations were not specifically identified. Rather, PennDOT had the discretion to deem an inspector's experience "acceptable" so long as the inspector possessed the requisite educational background or certification. Tables B and C provided more specific guidance

---

[1] "NICET" is the National Institute for Certification in Engineering Technologies.

regarding the combinations of professional certifications, educational background and field experience required for each of the seven classification levels. According to the Tables, an inspector could satisfy the requirements of any given classification level by possessing either of the following: (1) the specified NICET certification and years of field experience as provided in Table B; or (2) a combination of education and experience that would be "equivalent" to the NICET certification and years' experience ("NICET-equivalent") as provided in Table C.

The Scope of Work's "Section B" stated:

> The Engineer shall make a detailed background check on all potential staffing candidates and then submit their proposed wage rate and resumes in sufficient detail to assure the Department that the individual meets and/or exceeds the requirements for the Departments Inspection Classification for which the individual is being considered. Individuals are not considered approved for this agreement just because their names and rates are included in the Engineer's proposal. The job descriptions and requirements for the various Departments Inspection Classifications are attached hereto as Attachment 'A.' . . .

Attachment A provided more in-depth explanations of the many combinations of either certifications and experience or educational background and experience that would qualify an inspector at the various inspector classification levels. At the end of the description of each classification level, Attachment A provided that, even if the inspector does not meet the NICET certification or education and experience requirements specified, he or she could be deemed qualified by PennDOT if he or she possessed "[a]ny equivalent combination of experience and/or training [that] provide[d] the required knowledge, skills, and abilities." [Doc. No. 415 at Ex. H.] The parties refer to this as the "catch-all" provision.

B.    **Arnold's Review of Inspector Credentials**

Arnold worked for PennDOT for 30 years. At the time of his retirement in 2005, Arnold held the position of Assistant Construction Engineer ("ACE") in District-11, which covers southwestern Pennsylvania. As an ACE, Arnold's job responsibilities primarily consisted of supervising final staff reviews and conducting audits of materials quantities used on selected construction projects within the district. He reported to the Assistant District Engineers, who ultimately were responsible for all of the projects within the district.

In late 1999, Arnold became concerned that the consulting firms PennDOT was hiring to do inspection work were inflating the credentials of their inspectors to obtain higher pay rates. To test his suspicions, Arnold began randomly examining the résumés that the consulting firms submitted to PennDOT against the qualification requirements for the various inspector classifications in the standard form. His review of the consultant inspectors' credentials was limited to the projects within District-11, where he was assigned.

In 2002, Arnold uncovered several instances of what he believed were significant misrepresentations of the qualifications and experience of consultant inspectors assigned to District-11 projects between 2000 and 2002.[2] Based on his personal review, Arnold concluded that 25 percent of the inspectors whose credentials he examined were not qualified to be paid at

---

[2] As an exhibit to his response brief [Doc. No. 425], Arnold enclosed a spreadsheet listing 21 inspectors whose credentials he alleges CMC submitted knowing that they were inflated. Of these 21 inspectors, only five were for projects within District-11. CMC argues that, under Fed. R. Civ. P. 37(c)(1), the Court should refuse to consider this evidence because: (1) Arnold identified only two of these individuals in his Rule 26(a)(1)(A) disclosures and in his many depositions, despite CMC's repeated requests that he name every CMC inspector whom he alleges was the basis of a false claim; and (2) he produced the spreadsheet ten days after discovery closed. The Court need not address these arguments, however, because the language giving rise to Arnold's suspicions in District-11 was present in all of PennDOT's contracts at the time Arnold undertook his review. Thus, the scienter analysis for the claims CMC submitted for its District-11 inspectors applies to all of its submissions, regardless of construction district. *See* Analysis, *infra*.

the classification levels submitted by the consultant firms. Arnold avers that these "inflated" credentials resulted in overbillings to PennDOT and, ultimately, to the USDOT, thereby triggering liability under the FCA. Although Arnold claims that CMC's submissions were "inflated," he does not maintain that the résumés themselves were objectively false.

Arnold predicates his allegations of fraud on his interpretation of the Scope of Work. As he reads it, the qualifications of the minimum number of inspectors determined by Table A can be established only by referencing Tables B and C. Attachment A's catch-all provision, which would permit an inspector to be qualified if he or she possesses an "equivalent combination of experience and/or training" acceptable to PennDOT, cannot be used as a substitute for the Table B and C requirements, because this "would reduce the credentialing requirements of all inspectors to the catch-all standard in Attachment A." [Doc. No. 425 at 20.] Arnold contends that his interpretation is the only one that the language supports.

However, Arnold's interpretation was not the only one maintained by PennDOT officials at the time he undertook his review. When Arnold explained his interpretation of the language to his superior, Tucker Ferguson, the Chief of the Contract Management Division of PennDOT's Bureau of Construction and Materials, Ferguson disagreed with it. In fact, Ferguson testified that the construction of the standard form was a "gray area" that was a "question of interpretation." [Doc. No. 415, Ex. S at 43, 46-47.] According to Ferguson, it would have been reasonable for engineering firms submitting bids on PennDOT projects to interpret the catch-all provision of Attachment A as applicable to credentialize every inspector assigned to a project. [Id.] As Ferguson described it, the standard forms "list two [Tables, B and C, which provided] ways individuals can be approved or meet these standards, and then at the end [in Attachment A]

we say if they don't meet any one of those we can look at a combination of those to determine if someone" was qualified for a particular inspector classification level.  [Id. at 45.]

John Ekiert, another of Arnold's superiors at District-11, also testified that the applicability of Attachment A's catch-all provision to entire inspection staff was "open to interpretation." [Doc. No. 415, Ex. V at 48.]  This wider application of the catch-all provision was the interpretation of the standard form's language that CMC relied on in submitting its inspectors' credentials to PennDOT prior to 2003.

Arnold also identified several résumé submissions as misleading because the consultant firms treated "a year" of inspection experience as equal to "a construction season," a period of time that was typically only 8 or 9 months long.  Thus, a firm may have submitted an inspector for classification at a level requiring "three years" of experience even though the inspector may have had only 27 months' experience, the equivalent of three construction seasons.  However, Ferguson again indicated that this disconnect was a matter of "different people [] interpreting one year [] differently" and conceded that PennDOT had never clarified whether a "year" meant a calendar year or was a technical term of art synonymous with a construction season.[3]  [Doc. No. 415, Ex. S. at 56.]

In response to these dichotomous and conflicting interpretations, PennDOT initiated an internal review of several consulting agreements, as well as the language of the standard form.  This review was conducted at the highest levels of the agency.  In the course of its review, PennDOT put on hold the contracts of several firms whose inspectors they felt did not, even in light of the acknowledged interpretation issues invited by the standard form's language, possess the requisite qualifications to bill at certain classification levels.  PennDOT reached settlements

---

[3] PennDOT eventually defined a year of experience as "6 continuous months of employment or 8 months in a 12 month period, but in no case would a person [qualify] for 2 years [of experience] in a span of 12 months." [Doc. No. 415, Ex. S. at 57.]

with many of these firms, including CMC.  In its settlement agreement with CMC, PennDOT emphasized that none of CMC's submissions were false or misleading.  Tucker Ferguson testified that revising the "gray area[s]" in the language was a long-term undertaking, which ultimately resulted in the dissemination of guidance designed to make the qualifications approval process more consistent and clear for the consultants.

      C.    **Arnold Files Suit**

Arnold filed this lawsuit in 2003, alleging that CMC and several other firms knowingly filed false claims to PennDOT, which were then relied upon by the FHWA in remitting excessive payments for the work PennDOT's consultant inspectors performed.  The Complaint has been amended twice, and CMC is the only remaining Defendant.

**ANALYSIS**

To establish a violation of the FCA, a relator must show that the defendant knowingly made or caused to be made to an agent of the United States a false or fraudulent claim for payment.  U.S. ex rel. Wilkins v. United Health Group, Inc., 659 F.3d 295, 304 (3d Cir. 2011); see also 31 U.S.C. § 3729(a)(1)(A)-(B).  The FCA's scienter requirement is satisfied if the defendant:  (1) has actual knowledge that the claim is false; (2) acts in deliberate ignorance of the truth or falsity of the claim; or (3) acts in reckless disregard of the claim's truth or falsity. § 3727(b)(1)(A).  No proof of specific intent to defraud is required.  Id. at (b)(1)(B).

The FCA provides a civil enforcement tool to recover government funds that are lost to fraud and abuse.  S. Rep. No. 111-10 (2009) at 11.  In response to the Supreme Court's decision in Allison Engine v. U.S. ex rel. Sanders, 553 U.S. 662 (2008), Congress clarified that liability under the FCA "attaches whenever a person knowingly makes a false claim to obtain money or

8

property, any part of which is provided by the Government without regard to whether the wrongdoer deals directly with the Federal Government; with an agent acting on the Government's behalf; or with a third party contractor, grantee, or other recipient of such money or property." S. Rep. No. 111-10 at 11.[4]

Arnold claims that CMC violated the FCA by submitting bills to PennDOT for inspection services performed by engineers who were improperly classified under the standard form, which resulted in overbillings that were then passed on to the federal government. Because Arnold has not met his burden in proving that CMC acted with the requisite scienter, however, CMC's Motion for Summary Judgment will be granted.

### A.   Scienter

Under the FCA, "knowingly" includes only "a defendant's actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of information in the defendant's claim to the government." U.S. ex rel. Hefner v. Hackensack Univ. Med. Ctr., 495 F.3d 103, 109 (3d Cir. 2007) (internal quotation marks omitted). Proof of the defendant's specific intent to defraud the government is not required to sustain an FCA violation. Id. In designing the scienter requirement in this fashion, "Congress explicitly expressed its intention that the act not punish honest mistakes or incorrect claims submitted through mere negligence." Id. While courts should be hesitant to grant summary judgment when a case turns on a state of mind determination, U.S. ex rel. Taylor-Vick v. Smith, 513 F.3d 228, 232 (5th Cir. 2008), they are not prohibited from doing so in an FCA case when there is no genuine dispute as to whether the defendant acted knowingly. Hefner, 495 F.3d at 110.

---

[4] At least one court of appeals has held that Congress's 2009 amendment to the FCA legislatively overruled Allison Engine. U.S. ex rel. Wall v. Circle C Const., L.L.C., 697 F.3d 345, 360 n.3 (6th Cir. 2012).

In 1986, Congress clarified the scope of "knowing" conduct that would give rise to liability under the FCA. Specifically, the House Judiciary Committee explained that the FCA is intended to reach "persons who ignore 'red flags' that the information [submitted in a claim] may not be accurate or those persons who deliberately choose to remain ignorant of the process through which their company handles a claim. . . . This definition, therefore, enables the Government not only to effectively prosecute those persons who have actual knowledge, but also those who play the 'ostrich.'" H.R. Rep. No. 660-99 (1986), at 20-21. The Committee further provided that, while "individuals and contractors receiving public funds have some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek," a "rigid definition of that duty . . . would ignore the wide variance of circumstances under which the Government funds its programs." Id. at 20. Consequently, "[o]nly those who act in 'gross negligence' of this duty will be found liable under the False Claims Act." Id.

### B. The Standard Form's Language

Arnold has failed to present evidence sufficient to show that CMC had actual knowledge that the qualifications of its consultant inspectors were deficient or that CMC acted with deliberate ignorance or reckless disregard of whether its inspectors were aptly qualified. He also has failed to prove that CMC specifically intended to defraud PennDOT and thus, by extension, the federal government. His failure to meet this burden entitles CMC to judgment as a matter of law.

The only dispute between the parties is the interpretation of the standard form's pre-revision language. However, even when viewed in the light most favorable to Arnold, this dispute is neither genuine nor material. Assuming that Arnold's interpretation of the standard form is correct, he has not presented any facts to dispute that the language's "loose

interpretation" was PennDOT's practice prior to 2003. Arnold does not dispute that nothing other than the standard form's language was available to consultant firms to guide them in submitting inspector credentials to PennDOT for approval. In their depositions, Arnold's superiors testified that a submission of résumés based on an expansive reading of Attachment A's catch-all provision and seasonal definition of a "year" would not have been false or misleading, but rather would have been a matter of "interpretation" ultimately subject to PennDOT's approval. [Doc. No. 415, Ex. S at 117.]

CMC did not calculatingly ignore or disregard any "red flags" because, as Ferguson and Ekiert testified, these aspects of the standard form "were gray and loosely interpreted by the consultants[ and] loosely interpreted by the department," thus rendering CMC's interpretation of the contract language reasonable. [Id. at 95.] Arnold's superiors also clarified that PennDOT's goal in revising the standard form's language was to make it "easier to understand," not to combat fraud and abuse. [Id. at 23.] Thus, this record cannot support a finding that CMC acted with actual knowledge, gross negligence or reckless disregard with respect to the submission of its inspectors' credentials.

Moreover, the Scope of Work very clearly stated that no inspector could work on a PennDOT project without PennDOT's approval of the inspector's credentials. Tucker Ferguson confirmed this protocol in his deposition, which Arnold does not dispute. Although the record indicates that the ACEs in some construction districts did not verify the inspectors' qualifications, Arnold did not offer evidence indicating that CMC was aware of this and submitted its inspectors' credentials knowing that they would be blithely rubber-stamped. Such a proffer could potentially support an inference that CMC acted with actual knowledge, deliberate ignorance or reckless disregard. Any evidence to this effect is, however, totally absent

from the record. Consequently, CMC was entitled to rely on the language in the Scope of Work indicating that if PennDOT determined that an inspector did not possess the requisite qualifications for the submitted classification level, it would not approve the inspector to work on the project.

Viewing these facts in the light most favorable to Arnold, the most generous conclusion that can be drawn is that CMC's interpretation of the standard form language was reasonable when CMC submitted its inspector credentials to PennDOT, but that PennDOT ultimately adopted a different view. At most, this supports an inference that CMC was negligent in its submission of inspector credentials to PennDOT. However, the law is clear that mere negligence cannot sustain a claim under the FCA.

    C.    **Government Knowledge Inference**

CMC's lack of scienter also is supported by the fact that PennDOT had a practice of instructing consultant firms to submit certain inspectors at classification levels higher than their credentials supported. On summary judgment, this evidence, which Arnold does not dispute, negates a finding of scienter. U.S. ex rel. Durcholz v. FKW, Inc., 189 F.3d 542, 543 (7th Cir. 1999).

Several courts of appeals have adopted the "government knowledge inference" doctrine to help distinguish claims submitted with scienter from those submitted without scienter. Under this doctrine, "when the government knows and approves of the facts underlying an allegedly false claim prior to presentment," an inference arises that the claim was not knowingly submitted, regardless of whether the claim itself is actually false. U.S. ex rel. Burlbaw v. Orenduff, 548 F.3d 931, 951 (10th Cir. 2008); accord U.S. ex rel. Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 289 (4th Cir. 2002); Durcholz, 189 F.3d at 543; U.S. ex rel.

Kreindler v. United Techs. Corp., 985 F.2d 1148, 1157 (2d Cir. 1993); U.S. ex rel. Hagood v. Sonoma Cnty. Water Agency, 929 F.2d 1416, 1421 (9th Cir. 1991).  Although the Court of Appeals for the Third Circuit has not addressed the issue, it has striven for consistency with other circuits on the interpretation of the FCA generally, see Wilkins, 659 F.3d at 306, and the inference is consistent with the Court's holding that the FCA is not designed to punish defendants who make "honest mistakes" or act with mere negligence.  Hefner, 495 F.3d at 109.  This Court, therefore, will apply the inference.

      Arnold does not dispute that, on at least one occasion, PennDOT instructed CMC to submit a potential inspector, Margaret Whisner, at a classification level higher than what she qualified for because PennDOT wanted to secure her services on a particular project.  According to CMC employee Anthony DiFrancesco, CMC submitted Whisner as a Transportation Assistant, the lowest inspector classification level.  DiFrancesco testified that Whisner "was qualified as a TA.  Our efforts to hire her were as a TA until [PennDOT] came to us and said no.  She's driving from Pittsburgh.  She'll need more money than that.  Submit her as a [Transportation Construction Inspector]," a classification that ranks two levels above a TA.  [Doc. No. 415, Ex. T at 61-62.]  At the time of Arnold's review, TAs were compensated at $12.13/hour, while TCIs were compensated at $17.65/hour.  [Id. at Ex. H.]

      This evidence demonstrates that, at least with respect to any claim against Whisner's billings, PennDOT was fully aware that her qualifications were deficient when measured against the strict parameters of the standard form.  Nonetheless, PennDOT approved of and affirmatively instructed CMC to submit her at a higher level.  Regarding Whisner, the record is sufficient to apply the government knowledge inference to absolve CMC of scienter.  More broadly, these facts show, as Tucker Ferguson testified, PennDOT's role in furthering a "loose interpretation"

of the standard form among its consultants. The only reasonable conclusion that the sum of this evidence supports is that CMC did not possess the scienter necessary to sustain an FCA claim. Arnold's claim fails, and CMC is entitled to summary judgment.

For all of the reasons stated above, the Court hereby enters the following:

## II. ORDER

Defendant's Motion for Summary Judgment [**Doc. No. 415**] is **GRANTED**.

May 28, 2013                                         s\Cathy Bissoon
                                                     Cathy Bissoon
                                                     United States District Judge

cc (via ECF email notification):

All Counsel of Record